**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BARRY HONIG and GRQ
CONSULTANTS, INC.,

                        *Plaintiffs*,

     v.

GREGORY D. COHEN and BULLDOG
BOXING PROMOTIONS LLC,

                        *Defendants*.

Civil Action No.

**COMPLAINT**

---

        Plaintiffs Barry Honig ("Honig") and GRQ Consultants, Inc. ("GRQ"), by and through

their undersigned attorneys, as and for their Complaint against Gregory D. Cohen ("Cohen") and

Bulldog Boxing Promotions LLC ("BBP"), hereby allege as follows:

**I.**       **NATURE OF THE ACTION**

        1.       Plaintiffs, longstanding lenders for Defendant Cohen's boxing business, are victims

of an elaborate and long-running fraudulent scheme. Defendants repeatedly solicited Plaintiffs for

monies, supposedly to support Cohen's boxing business, using enticing – and as it now turns out,

mostly false – claims of securing fighters to exclusive contracts and large purse earnings for

Plaintiffs. Not only were Defendants routinely lying to Plaintiffs, but to support their lies, they

went so far as to fabricate documents and impersonate other individuals, all of which led Plaintiffs

to extend additional financing and had the effect of deferring the moment when Plaintiffs would

hold Defendants to account for violating re-payment obligations under existing contracts between

the parties.

        2.       Defendants employed a strategic approach to persuade Plaintiffs to finance new

fighters and boxing endeavors. Defendants would claim to need financing for, among other things,

advancing boxers' signing bonuses, training fees, sanctioning fees with the bodies that oversee

boxing matches, travel fees for boxers, legal fees associated with the various agreements needed to document the promotional relationships, registration fees, visa fees, purses, and other alleged business-related purposes. Then Defendants would promise not only reimbursement but lucrative payouts when the boxers participated in bouts.

3.      Sometimes Defendants' assurances were based on real facts, but oftentimes they were not. In those instances, Cohen's pattern was to continue his deceptions for months, even when questioned by Honig. More recently, Honig has confronted Cohen about these lies and Cohen has not disputed them.

4.      By the end of 2022, Cohen and his affiliated entities Greg Cohen Promotions, LLC ("GCP") and BBP had racked up a debt of over $2 million to Plaintiffs – a debt that Defendants have acknowledged on multiple occasions.

5.      Plaintiffs and Defendants entered into a series of agreements that documented the parties' financing relationship. The initial understanding between the parties was that Plaintiffs would loan monies to Cohen and his entities specifically to fund individual fighters. Under this understanding, Plaintiffs would receive their advanced expenses first, and then 50% of the revenues and/or profits received by Cohen and his entities. The economics changed after Cohen breached multiple agreements and failed to repay Plaintiffs moneys owed.

6.      On November 5, 2019, the parties executed a Standstill Agreement in which Cohen acknowledged a then-outstanding debt of $1,026,000. This Standstill Agreement has been amended since 2019 on multiple occasions (such amendments together with the original Standstill Agreement, the "Financing Agreements"), resulting in Plaintiffs advancing additional monies to Defendants. The Financing Agreements required Defendants to repay their debt to Plaintiffs through both direct reimbursement and the sharing of revenues from fights, but Defendants

2

repeatedly failed to do so. To this day, Defendants continue to fail to share revenues from fights as promised.

7.      Since entering into the Financing Agreements, Cohen has repeatedly lied to Honig when requesting loans to supposedly fund signing bonuses, advances for new fighters, training fees, visas, sanction fees, and special permit fees. In numerous instances, Defendants lacked any relationship with these boxers, and the fights that Plaintiffs were led to believe they were funding never occurred. Defendants' lies resulted in their misappropriation of hundreds of thousands, if not millions, of dollars of Plaintiffs' money. What is more, Defendants have fabricated documents and – in a particularly bizarre turn – impersonated other boxing promoters as well as the President of the World Boxing Association ("WBA"), all in an effort to induce Plaintiffs to continue extending financing, and to forestall the inevitable moment when Plaintiffs would discover Defendants' mountain of lies and enforce their rights.

8.      In addition, Defendants agreed both orally and in writing to provide Plaintiffs with supporting documentation including contracts, memorandums, agreements, financial records, tax returns and all other material documents necessary to audit the operations of BBP and Cohen individually. But Defendants have refused to provide the documents that they were contractually obligated to produce, preventing Plaintiffs from knowing the full extent of Defendants' contractual breaches and fraud.

## II.      PARTIES

9.      Plaintiff Barry Honig is an individual who resides in Boca Raton, Florida.

10.     Plaintiff GRQ Consultants, Inc. is a Florida corporation with its principal place of business in Boca Raton, Florida.

11.     Defendant Cohen is an individual who resides in Livingston, New Jersey.

665000.v3

12.     Bulldog Boxing Promotions LLC ("BBP") is a limited liability company organized under the laws of New Jersey. On information and belief, BBP's members are Cohen (domiciled in New Jersey) and Gino Limeri, who resides in and is domiciled in New York. BBP's principal place of business is in New York. BBP was created in 2020, on information and belief for the purpose of permitting Cohen to shield or hide revenues and assets from creditors; by then, GCP and Cohen were heavily indebted. On information and belief, Cohen employed Limeri to act as BBP's President and as Cohen's agent, and Limeri took direction from Cohen regarding the day-to-day operations of BBP. BBP was a shell for Cohen, who, as detailed below, exercised complete domination of that entity.

13.     Nonparty Greg Cohen Promotions, LLC ("GCP") is a limited liability company organized under the laws of New Jersey that serves as a shell for and is completed dominated by Cohen, who is the majority or sole owner of GCP. GCP's principal place of business is in New York. Cohen formed GCP in 2011 to engage in the business of boxing promotion. On information and belief, Cohen ceased to use GCP for his boxing business at some point in the past several years.

### III.     JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000.

15.     The Court's personal jurisdiction over both Defendants rests on numerous independent grounds.

16.     The Court has general personal jurisdiction over Defendant BBP because its principal place of business is in New York.

665000.v3

17.     The Court has personal jurisdiction over Defendant Cohen because in Section 13 of the Standstill Agreement, Cohen expressly consented to "the exclusive jurisdiction of the state and federal courts sitting in the State and County of New York for the adjudication of any dispute hereunder or in connection herewith and waive[d], and agree[d] not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper." The forum-selection clause in the Standstill Agreement also furnishes an independent basis for the Court's specific personal jurisdiction over Defendant BBP: under the Financing Agreements, BBP has assumed the obligations of GCP under the Standstill Agreement.

18.     The Court also has long-arm jurisdiction over Cohen (and would have long-arm jurisdiction over BBP even if it did not have its principal place of business in New York). Cohen and BBP transacted the business that is the subject of this Complaint in New York, and defrauded Plaintiffs through acts that occurred primarily if not exclusively in New York. Cohen and GCP's office as set forth on letterhead is in the Empire State Building in New York, New York (350 Fifth Avenue). Cohen and GCP entered into agreements with Honig that used that address. *See, e.g.*, Exhibits E and F. Cohen's email signatures list a 212- office phone number – further confirming that Cohen works out of New York, New York. And Limeri, who is Cohen's front-facing employee at BBP, lives, and on information belief works, in New York.

19.     The court additionally has personal jurisdiction over Cohen because (as further described below) he used GCP and BBP as alter egos, and each of those entities is subject to the general personal jurisdiction of this Court by virtue of having its principal place of business in New York.

20.     Venue is proper in this District because of the forum selection provision in Section 13 of the Standstill Agreement and pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3).

## IV.     FACTUAL ALLEGATIONS

### A.     Background on boxing promotion

21.     In the boxing world, boxers, or fighters, typically enter into promotional agreements with promoters. These agreements are often exclusive, meaning that the boxer is permitted to work only with the contracting promoter for the duration of the contract. Such agreements are sometimes referred to as exclusive promotional agreements, or EPAs. An EPA provides for a profit-sharing arrangement between the promoter and the fighter; sometimes the EPA provides that profit-sharing will be separately negotiated for each fight in which the boxer participates.

22.     Upon signing an EPA, the promoter sometimes pays the fighter a signing bonus and agrees to cover certain expenses of the fighter such as training, travel expenses, and other fees. The promoter is responsible for marketing the fighter to fans to generate an audience for any bouts, as well as for organizing and promoting the fights themselves by contracting with a television network to air the fight, selecting and paying the venue, advertising the event, seeking sponsorships, and the like.

23.     Additionally, promoters will sometimes enter into co-promotional agreements with other promoters. Co-promotional agreements typically provide for a sharing of profits from an event or from a fighter participating in an event.

24.     The highest-paid fights involve those between ranked boxers. The ranking of boxers is overseen by one of four major sanctioning bodies. Sanctioning bodies will determine the rankings and sometimes order mandatory bouts between fighters. Championship belts are awarded

to the winner of a sanctioned title bout in various weight classes. The WBA is one of the sanctioning bodies.

**B.    Honig lends money to support Cohen's business.**

25.    Beginning in 2012, Cohen sought funding from Honig to assist with financing Cohen's boxing business.

26.    In addition to Honig personally, GRQ also lent money to Cohen and BBP. The initial agreement between Cohen and GCP, on the one hand, and Honig and GRQ, on the other, was that Plaintiffs would be repaid from profits related to specific bouts involving GCP's fighters. But despite Defendants' constant promises of repayment and of lucrative bouts, repayments were few and far between.

27.    By October 2019, Cohen and GCP owed over $1 million to Plaintiffs.

**C.    In November 2019, Cohen enters into an agreement with Plaintiffs to settle his then-outstanding debt**

28.    On or about November 5, 2019, Cohen and GCP, on the one hand, and Honig and GRQ, on the other, entered into a Stipulation and Standstill Agreement (the "Standstill Agreement" or "Agreement"). The Standstill Agreement is attached as Exhibit A.

29.    The Agreement acknowledged that Cohen and GCP then owed Honig and GRQ $1,026,000. Under the Agreement, Honig and GRQ would not enforce their claims related to the outstanding debt provided that Cohen and GCP "strictly compli[ed]" with the terms of the Agreement.

30.    The Agreement provided that Cohen or GCP would repay the debt to Plaintiffs by sharing all of GCP's gross revenues from fights with Honig and GRQ. The amount of revenue sharing depended on whether GCP was the lead promoter and how much revenue was generated from the fight.

31.     In Section 2(d) of the Agreement, Cohen personally guaranteed the payment obligations of GCP.

32.     In Section 2(g) of the Agreement, GCP also agreed to pay Honig and GRQ 40% of its gross revenues generated by certain fighters after the full repayment of the then-accrued loan balance as long as those fighters were under contract with GCP or any affiliate of Cohen or GCP. One of those fighters was Jarrell Miller.

33.     Section 3 of the Agreement provided that Cohen "shall provide [Plaintiffs] with any information or documentation requested by [Plaintiffs] to verify any of the Cohen Parties' obligations hereunder and compliance therewith," as well as "copies of all [his] tax returns for each year commencing with the return for 2019 until the Loan Balance is paid in full."

34.     Section 4 of the Agreement provided that Plaintiffs would be owed an automatic additional $125,000 (denominated "liquidated damages") on top of any remaining debt if GCP failed to make any of the required payments under the Agreement.

35.     Section 16 of the Agreement further provided that if GCP ceased operations, the loan balance would "immediately come due in full."

36.     Section 17 of the Agreement prevented Cohen or GCP from operating a boxing business other than in their own names and/or otherwise circumventing Plaintiffs' rights under the Agreement.

37.     Defendants have been in breach of each of the above-described provisions, in some cases almost since the Agreement was first signed.

665000.v3

### D.    In October 2020, the Parties Modify the Standstill Agreement

38.    On October 13, 2020, Cohen and GCP, on the one hand, and Honig and GRQ, on the other, amended the Standstill Agreement ("Standstill Addendum"). The Standstill Addendum is attached as Exhibit B. The Standstill Addendum is one of the Financing Agreements.

39.    The Standstill Addendum acknowledged that Cohen had paid Plaintiffs only $8,000 since the Standstill Agreement was signed and that Cohen and GCP still owed Plaintiffs a balance of at least $1,018,000.

40.    The Standstill Addendum also made clear that Plaintiffs reserved all rights to recover any unpaid debt.

41.    The Standstill Addendum also provided that Plaintiffs would make another $40,000 payment to Cohen/GCP and set forth revised revenue sharing for certain fights involving Bogdan Dinu.

42.    In reliance on this agreement, Honig wired $40,000 to GCP on October 13, 2020; the Standstill Addendum expressly acknowledged that "[t]he new balance [owed by GCP and Cohen to Plaintiffs] is $1,058,000."

### E.    BBP assumes Cohen's and GCP's debt to Plaintiffs

43.    Approximately six months after the parties entered into the Standstill Addendum, it became clear that Cohen had begun to use BBP and Limeri to conduct his boxing promotion business. Because the Standstill Agreement prevented Cohen and GCP from operating a boxing business under a new name, BBP expressly acknowledged in the Financing Agreements that it would be liable for GCP's and Cohen's outstanding debts to Plaintiffs that were the subject of the Standstill Agreement.

665000.v3

44.     On April 13, 2021, BBP and Honig entered into a Memorandum of Understanding (the "Miller MOU") that modified the Standstill Agreement and Standstill Addendum. The Miller MOU is attached as Exhibit C. The Miller MOU is one of the Financing Agreements.

45.     In the Miller MOU, BBP promised that it would (a) repay all outstanding debt of Cohen and GCP – the debt covered by the Standstill Agreement and Standstill Addendum, as well as (b) reimburse Plaintiffs for all moneys that they had advanced for the fighter Jarrell Miller. After those amounts had been paid, BBP would share with Honig, on a 50/50 basis, revenues from BBP's EPA with Miller.

46.     In an email dated May 14, 2021 to Honig, copied to Cohen, Jonathan Schwartz of BBP attested that BBP had instructed another promoter to send the revenues from a June 5, 2021 fight between Bogdan Dinu and Daniel Dubois to Honig's designee "as debt repayment from GCP/Greg Cohen." In other words, consistent with the Miller MOU, BBP had assumed and was retiring debt that was the subject of the Standstill Agreement and Standstill Addendum. Honig trusted that these moneys would be paid, and continued to loan money to Defendants because Cohen had previously provided him a purported agreement between BBP and the other promoter related to a potential Dubois-Dinu bout.

47.     On October 3, 2021, BBP, Honig, and Cohen entered into a Memorandum of Understanding that further modified the Standstill Agreement and Standstill Addendum. The October 2021 MOU is attached as Exhibit D. The October 2021 MOU is one of the Financing Agreements.

48.     The October 2021 MOU provided that BBP would pay Honig or his designee 80% of the "next $1,800,000 in revenue received by BBP" and the remaining 20% as directed by Cohen. It further provided that any reimbursement of expenses advanced by Honig would be remitted

10

100% to Honig or his designee. After BBP earned $1,800,000 in revenue and Honig's advances had all been reimbursed, Honig and Cohen would split all revenue 50/50.

49.     The October 2021 MOU was explicit that payments to Honig would be "repayment of debt" owed by Cohen and GCP – the same debt that had been the subject of the Standstill Agreement and Addendum.

50.     The October 2021 MOU contained a carve-out for any compensation received as a result of a Daniel Dubois bout, allowing BBP to retain just $10,000 for each bout. It also contemplated further discussions related to the splitting of revenue for Dubois.

**F.     In 2021 and 2022, Plaintiffs extend additional financing to BBP and GCP**

51.     After execution of the Standstill Addendum, in response to requests from Cohen, Plaintiffs loaned additional amounts to BBP and GCP directly, or on their behalf to third-party vendors or fighters specified by them or Cohen.

52.     In total, from the date of signing the Standstill Addendum through December 1, 2022, Cohen and his affiliates had racked up a debt as follows:

| Date | Amount | Recipient |
|---|---|---|
| 10/13/20 | $1,058,000 | Loan balance as of date of Standstill Addendum |
| | $125,000 | Standstill Agreement "liquidated damages" |
| 11/12/20-12/01/2022 | $795,907.50 | Additional loan payments |
| TOTAL | $1,978,907.50 | |

53.     Yet, since signing the Standstill Addendum, Cohen and his entities have only paid back $341,486.79, leaving a balance of $1,637,420.71 in unpaid debt. Cohen and BBP are liable to Plaintiffs for those amounts pursuant to the Financing Agreements.

54.     And Cohen and/or BBP have earned revenues that they failed to share in violation of the operative agreements.

11

665000.v3

55.     In emails dated September 2, 2022, Cohen solicited $7,500 from Plaintiffs to cover the training expenses for fighter Hasim Rahman, Jr. Cohen told Honig that BBP would earn $40,000 on a fight between Rahman and Victor Belfort. Belfort was eventually replaced by Greg Hardy. The Rahman-Hardy fight went forward on November 23, 2022. Plaintiffs learned that BBP received over $120,000 for that fight. Not only were Plaintiffs due payment pursuant to the parties' contracts for the sharing of revenues, but Plaintiffs also were owed reimbursement for their advancement of Rahman's expenses.

56.     Honig repeatedly demanded that Cohen turn over the monies due to Plaintiffs from the Rahman-Hardy fight, as required by the Financing Agreements. But BBP never paid Plaintiffs and instead kept the net proceeds for itself.

57.     On or about March 18, 2023, Miller fought Lucas Brown, resulting in revenue to BBP. But BBP did not remit any money earned from that fight to Plaintiffs either – another breach of the Financing Agreements.

58.     Based upon information and belief, Defendants continue to operate a boxing business and earn revenues from sanctioned bouts. A percentage of those revenues is owed to Plaintiffs under the Financing Agreements.

59.     Plaintiffs have identified at least the following boxing events, all of which involved Cohen/BBP fighters (bolded below), that have taken place just since January 1, 2023. Many of the bouts listed are high-earning WBA Title Bouts.

    a.  January 5, 2023 – **Partick Aryee** v. Bright Ayala – Ghana

    b.  January 13, 2023 – **Fernley Feliz Jr**. v. Deon Ronny Hale – Murfreesboro, TN

    c.  February 18, 2023 – **Wifredo Flores** v. Gary Cully – Nottingham, UK – WBA Title Bout

    d.  March 5, 2023 – **Solomon Adebayo** v. Gbenga Oluokun – Lagos

665000.v3

e.   March 18, 2023 – **Jarrell Miller** v. Lucas Browne – Dubai

f.   May 18, 2023 – **Keith Hunter** v. Javonn Davis – Connecticut

g.   May 27, 2023 – **DeMichael Harris** v. Aaron Martinez – Atlanta

h.   May 27, 2023 – **DeCaree Scott** v. Aaron Chavers - Atlanta

i.   May 28, 2023 – **Solomon Adebayo** v. Musa Ntege – Lagos

j.   June 1, 2023 – **Ablaikhan Khussainov** v. Artur Subkhankulov – Moscow

k.   June 2, 2023 – **Keith Hunter** v. David Grayton - Connecticut

l.   June 9, 2023 – **Carlos Canizales** v. Daniel Matellon – Buenos Aires – WBA Title Bout

m.   June 9, 2023 – Carlos Canizales v. **Daniel Matellon** – Buenos Aires – WBA Title Bout

n.   June 10, 2023 – **Ivan Dychko** v. Ariel Esteban Bracamonte – Buenos Aires – WBA Title Bout

o.   June 10, 2023 – **Keith Hunter** v. Vlad Panin – Connecticut

p.   June 13, 2023 – **Fernely Feliz Jr** v. Terrence Walker – Nashville, TN

q.   July 22, 2023 – **Patrick Allotey** v. Serhii Bohachuk – Santa Ynez, CA – WBA Title Bout

r.   July 30, 2023 – **Solomon Adebayo** v. Issac Ekpo – Lagos

s.   August 15, 2023 – **Keith Hunter** v. Javonn Davis – Long Beach, CA

t.   August 19, 2023 – **Bastie Samir** v. Cleotis Pendarvis – Denver, CO

u.   August 11, 2023 – **Vaughn Alexander** – St. Louis, MO

v.   August 26, 2023 – **Daniel Dubois** v. Oleksander Usyk – Poland – WBA, WBO, IBO, IBF Title bout

60.   Defendants have failed to share any revenues from any of these fights.

61.   Upon information and belief, Cohen and BBP received promotional monies from other events involving BBP-promoted fighters and failed to pay Plaintiffs monies they were due under the Financing Agreements.

13

### G. Cohen repeatedly lied to Honig to extract payments supposedly for business-related expenses, but Cohen just pocketed the money

#### 1. Payments associated with Mickey Bey

*August 2019 - $40,000 advancement of expenses*

62.     In an August 2, 2019 conversation, Cohen requested $40,000 from Honig to fund a signing bonus for fighter Mickey Bey whom Cohen claimed would be fighting soon and whose fight could yield a purse of $500,000. At the time, Cohen had outstanding debt due to Honig and promised Honig that the $40,000 advance to Bey would be paid back when the debt was repaid, which would be on August 6, 2019.

63.     In reliance on these promises, on August 5, 2019, Honig caused $52,500 to be wired to GCP, of which $40,000 was for the Mickey Bey signing bonus. On information and belief, Defendants never paid Bey the signing bonus.

64.     This fraudulently obtained payment was part of the total debt included in the $1,026,000 debt acknowledged in the Standstill Agreement.

#### 2. Payments associated with Bastie Samir

*December 2020 - $165,000 advancement of expenses*

65.     On December 3, 2020, Cohen requested $165,000 from Honig supposedly for the purpose of purchasing the promotional rights for eight African fighters (one of which was Bastie Samir) from LPMG Global, LLC. Cohen also claimed to Honig that these rights could be immediately resold to MTK Global for $265,000 (with the possibility of additional payments from MTK to GCP in the future), with the immediately result that the $165,000 would be paid back to Honig, leaving a $100,000 profit for GCP, of which two thirds also would be paid to Plaintiffs and applied to their outstanding loans.

66.     In support of these claims, Cohen presented to Honig purported Assignment and Assumption Agreements dated December 3, 2020 (a) between LPMG and GCP, and (b) between MTK and GCP.

67.     On December 3, 2020, Honig entered into a Memorandum of Understanding with Cohen memorializing that, among other things, Honig would recoup $165,000 plus two-thirds of the $100,000, plus a percentage of future profits derived from the eight African fighters. The agreement was on GCP letterhead, with Cohen and GCP's address in the Empire State Building in New York, New York. A copy of this agreement is attached as Exhibit E.

68.     On December 4, 2020, in reliance on Cohen's statements and the Assignment and Assumption Agreements, Honig caused $165,000 to be wired to GCP. This loan also became new debt owed to Honig under the terms of the Financing Agreements.

69.     After Honig wired the money, he learned that MTK Global was affiliated with a drug cartel that had been sanctioned by the U.S. government – a fact of which Cohen was aware prior to soliciting the $165,000 payment from Honig. Cohen never had any intention of selling any rights to MTK Global.

70.     On top of that, Plaintiffs now understand that the Assignment and Assumption Agreements were bogus – they were forgeries. Plaintiffs understand that Cohen never purchased the promotional rights from LPMG but instead used the $165,000 for other purposes.

71.     When Honig began inquiring in December 2020 why he hadn't been repaid, Cohen created what Plaintiffs now understand to have been a phony email address for an individual supposedly associated with MTK and pretended to cancel the deal in a December 15, 2020 email to the phony email address, which Cohen blind-copied to Honig.

*March 2021 - $24,000 advancement of expenses*

72.     In subsequent emails including on March 4, 2021, Cohen continued to tout to Honig the profitability prospects of one of the eight African fighters (Samir) whose promotional rights GCP had supposedly purchased in December 2020.

73.     On March 22, 2021, Cohen solicited $24,000, which was supposed to cover the visa expenses of Samir and another boxer. In reliance on Cohen's statements, Honig wired $24,000 to GCP to cover these visa expenses. Honig expected repayment of this loan in accordance with the Financing Agreements.

74.     Although Cohen claimed to Honig that Samir was scheduled to fight a bout in Africa in January 2021, which would place him in the WBA rankings, Samir did not have a January 2021 bout. In fact, Samir had not fought at all in the previous 15 months and was not ranked by the WBA prior to March 31, 2021. Further, contrary to statements by Cohen, Samir was never scheduled to fight in the U.S. and so there was no need for him to obtain a US visa.

*September 2021 - $15,000 advancement of expenses*
*December 2021 - $15,000 advancement of expenses*

75.     On September 7, 2021, Cohen claimed that an opportunity for Samir to fight Badou Jack for the WBA light heavyweight title had been rescheduled for November 20, 2021. Cohen then asked for $15,000 to cover Samir's training expenses. Cohen promised the bout would generate $250,000 for GCP and Honig would recoup his $15,000 payment as well.

76.     On September 8, 2021, in reliance on Cohen's representations, Honig sent GCP $107,500, of which $15,000 was supposedly going to be used for Samir's training expenses. (The balance supposedly would cover advances and fees for other GCP fighters.) Honig expected repayment of this loan in accordance with the Financing Agreements.

77. On the morning of the November 20, 2021 bout, Cohen emailed Honig that Samir had tested positive for COVID and "the bout is being rescheduled for January/February" 2022.

78. These statements by Cohen were false or misleading; Samir was never scheduled to fight Jack. By September 2021, Jack and Samir were in different weight classes and on November 26, 2021 (six days after the supposed planned date for the Samir/Jack bout), Jack fought a different boxer, Samuel Crossed, in Dubai. In fact, the WBA stopped ranking Samir in October 2021. Honig, however, did not know this at that time.

79. On December 9, 2021, Cohen sent an email to Honig in which Cohen solicited him for an additional $15,000 to pay for Samir's training for his supposed upcoming bout against Jack.

80. On December 23, 2021, Cohen claimed that a Samir/Jack fight would happen on February 26, 2022, and forwarded Honig a copy of a purported Provision of Services Agreement ("POS") between GCP and promoter Probellum USA Corporation. Cohen claimed that the Samir bout would yield a $300,000 purse, and if Samir were to win, the bout would generate $600,000. Cohen requested $45,620 for various fighter related expenses, including $15,000 for Samir's training expenses.

81. On December 24, 2021, in reliance on Cohen's email, Honig wired BBP $35,000 which included the $15,000 for Samir. Honig expected to be repaid this amount pursuant to the Financing Agreements.

82. But the February 2022 fight never materialized either, with Cohen misleadingly claiming that Samir had missed weight.

83. Plaintiffs later learned from a Probellum officer that there never was a scheduled Samir/Jack bout and that the POS provided by Cohen was fraudulent.

665000.v3

### 3.    Payments associated with Carlos Canizales

*March -May 2021 - $135,500 advancement of expenses*

84.    In conversations in early March 2021, Cohen told Honig that GCP had signed boxer Carlos Canizales and provided Honig with a copy of a purported EPA between GCP and Canizales. The purported EPA was on GCP letterhead, with Cohen and GCP's address in the Empire State Building in New York, New York.

85.    In an email dated March 4, 2021, Cohen told Honig that Canizales would make his third title in the second quarter of 2021, which would yield enough money to pay back a $60,000 advance and earn a $100,000 promotional fee.

86.    In reliance on these statements, on March 4, 2021, Honig wired $60,000 to GCP to cover Canizales' signing bonus. Honig expected repayment of this loan in accordance with the Financing Agreements.

87.    In an April 1, 2021 email, Cohen asked Honig for an additional $18,000 for a visa for Canizales and two members of his support team so that he could fight a boxer in Texas. In reliance on these statements, Honig wired $18,000 to GCP.

88.    In a May 25, 2021 email, Cohen asked Honig for an additional $57,500 to fund a fight between Canizales and Esteban Bermudez. The $57,500 was allegedly for a payment to Bermudez to agree to fight Canizales, plus travel costs. Cohen claimed that this was a mere "tune up" bout for Canizales, and the WBA would next order a bout against WBA Super Champion Kyoguchi. Cohen claimed Honig would recoup the $60,000 Canizales signing bonus, the $57,500 Bermudez payment, and the $18,000 in visa expenses – for a total of $135,500.

89.    Cohen also provided Honig with a signed agreement on GCP letterhead (using the address in the Empire State Building in New York, New York), dated May 25, 2021, in which Cohen, on behalf of himself personally and GCP, promised Honig repayment for this fight and at

least $100,000 from the upcoming bout between Kyoguchi and the winner of the Bermudez-Canizales bout. Cohen claimed that "in the event that Bermudez is victorious GCP has secured 100% of his rights moving forward and the economics for the Kyoguchi bout (including recoupment) will be the same as Canizales v. Kyoguchi." This agreement is attached as Exhibit F and is another of the Financing Agreements between the parties.

90.     Demonstrating that Bulldog and GCP were two sides of the same coin, and that both were merely vehicles for Cohen, the May 25, 2021 agreement signed by Cohen also recited that "after Barry Honig is repaid 100% of his debt outstanding, he will retain 50% of all profits earned by Canizales and all fighters in [GCP] stable/roster, [BBP] stable/roster, or any other boxing related entity that Greg Cohen . . . ha[s] an interest in."

91.     Cohen's claims in the May 25, 2021 agreement (had they been true) all but guaranteed six-figure profits to Honig.

92.     In reliance on Cohen's statements, Honig wired an additional $57,500 to GCP on May 25, 2021. Honig expected repayment of this loan in accordance with the Financing Agreements.

93.     On May 28, 2021, Canizales lost to Bermudez. Cohen and his entities did not share any proceeds from this bout, or from the eventual Bermudez-Kyoguchi bout, with Honig.

### 4.     Cohen lied to Honig to induce payments supposedly for credit with WBA

*January 2021 - $60,000 advancement of expenses*

94.     On or about December 28, 2020, Cohen requested a $60,000 loan from Honig supposedly to purchase prepayment credits toward future sanctioning fees with the WBA. According to a December 30, 2020 email from Cohen to Honig, prepayment of $60,000 in sanctioning fees would give GCP a $180,000 credit with the WBA toward any such future fees.

95.     Cohen claimed that the credit would be needed for future fees and it would help the WBA out financially, given the loss of revenues the WBA experienced from cancelled events due to COVID.

96.     Cohen provided Honig with a letter purportedly signed by WBA President Gilberto Mendoza confirming the promised credits.

97.     On January 6, 2021, in reliance on Cohen's statements, and the purported WBA letter, Honig wired $60,000 to GCP. Honig expected repayment of this loan in accordance with the Financing Agreements.

98.     But Cohen lied to Honig. Very recently, Honig learned from the WBA that the WBA did not invite any promoter to prepay sanctioning fees or offer to give any promoter a 300% credit in exchange for prepayment of fees. In fact, according to the WBA, Cohen and his entities never made any payment to the WBA in December 2020 or at any other time as "prepayment" for future sanction fees.

99.     On top of that, Honig has learned that the letter purportedly from Mendoza was a forgery by Cohen: neither Mendoza nor anyone else at the WBA sent or authorized the letter.

100.    Cohen's statements to Honig in December 2020 and January 2021 were therefore false, and Cohen secured funds from Honig through use the of a fabricated document.

*July 2021 - $35,000 advancement of expenses*

101.    In an email sent on July 27, 2021, Cohen told Honig he needed $35,000 to apply for a "special permit fee" to get Samir into a WBA Light Heavyweight title fight which would take place in September 2021. According to Cohen, the bout would generate between $150,00-$300,000 of revenues if Samir participated in the fight. In reliance on these representations, Honig

wired $35,000 to GCP on or about July 27, 2021. Honig expected repayment of this loan in accordance with the Financing Agreements.

102.    Cohen then provided Honig with email exchanges involving phony addresses for Mendoza that Cohen had created. For instance, Cohen provided Honig with the following email:

> **From:** Gilberto Mendoza <gilbertojesusjrwba@gmail.com>
> **Date:** July 27, 2021 at 9:56:20 AM EDT
> **To:** Gcohen <gcohen@gcpboxing.com>
> **Subject: Re: Bastie Samir**
>
> yes, confirmed
>
> On Tue, Jul 27, 2021 at 9:52 AM Gcohen <gcohen@gcpboxing.com> wrote:
> Gilberto, as per our conversation this morning, please confirm that after filing the Expedited Special Permit for Bastie Samir to fight for the WBA Light Heavyweight World Championship, in the event that Samir is not granted the World Title opportunity the $35,000 fee will be reimbursed to GCP.
>
> Thank you
>
> Gregory D. Cohen

103.    Plaintiffs now understand that neither Cohen nor anyone else filed a special permit request for the Samir bout. (Even if a request had been filed, the special permit fee for the WBA's Light Heavyweight Division was $20,000, not $35,000.) What is more, Cohen fabricated emails to and from "Gilberto Mendoza" to create the false appearance that Mendoza had agreed that the WBA would reimburse the $35,000 in the event that Samir did not fight for the title.

104.    Cohen's statements to Honig in July 2021 were false, and Cohen used those false statements and fabricated emails to obtain money from Honig.

*October 4, 2021 - $100,000 advancement of expenses*

105.    On September 27, 2021, Cohen again requested a $100,000 loan from Honig supposedly to purchase additional WBA credits. Honig's $100,000 payment plus a $25,000

contribution from Cohen was supposed to give GCP a $250,000 credit with the WBA which would cover future sanctioning fees.

106.    Again, Cohen provided Honig with a letter purportedly signed by Mendoza confirming this agreement. The purported letter stated that GCP could make a demand for repayment in lieu of credits and the WBA would then be required to make payment within three days of receiving the request.

107.    On October 4, 2021, Cohen confirmed the details of their agreement as follows:

| | |
|---|---|
| From: | Greg Cohen <gcohen@colonialventuresllc.com> |
| Sent: | Monday, October 4, 2021 4:00 PM |
| To: | brhonig@aol.com |
| Subject: | Loan |

Barry, you have loaned GCP & Greg Cohen $100k which is being used to prepay sanctioning fees with the WBA.  You are not a party to any agreements between Greg Cohen & GCP with the WBA. The $100,000 you are extending will be returned after the November 20th Samir WBA Title bout.  As per GCP's September 29th agreement with the WBA, GCP will be receiving $125,000 from the WBA after GCP notifies the WBA in writing within 72 hours of said bout that they are electing to have their capital returned rather than receive the 2 to 1 credit on WBA fees.  Upon receipt of the $125,000 wire from the WBA, GCP will immediately return the $100,000 loan to Barry Honig.  The $100,000 will be returned before December 10th, 2021.

Thank you



**Gregory D. Cohen**
Chief Executive Officer

**Colonial Ventures LLC**

GCohen@ColonialVenturesLLC.com
**(973) 699-4714** (C)
**(212) 851-6425** (W)
**(212) 208-4472** (F)

108.    In reliance on Cohen's statements, which were memorialized in the October 4 email from Cohen, and on the purported WBA letter, Honig wired $100,000 to GCP on October 4, 2021. Honig expected repayment of this loan in accordance with the Financing Agreements.

109.    But the Samir fight referenced in Cohen's October 2021 email that was supposedly scheduled for November 20, 2021 never happened.

110.    And Plaintiffs now understand that this letter purportedly from Mendoza was yet another forgery by Cohen. The WBA has informed Honig that neither Mendoza nor anyone else at the WBA sent the letter and that the WBA has been unable to find any record of a $125,000 payment by Cohen, GCP, or BBP. The WBA has never received payment from Cohen or his entities as prepayment toward future sanction fees.

111.    Cohen thus obtained money from Honig based on false statements and a fabricated document.

112.    In March 2022, Honig inquired about the status of the "WBA loan."

113.    Cohen responded that "the wba loan is not overdue it's current according []to the terms of the agreement."

114.    Over the ensuing months, Cohen continued to perpetuate the fraud, falsely assuring Honig that the WBA would return the funds supposedly paid to it.

115.    Cohen never returned Honig's $100,000.

### 5.    Additional payments to Defendants were used for Cohen's personal expenses

*December 2021 – at least $35,000 advanced to BBP was used for Cohen's personal expenses*

116.    In a December 23, 2021 email, Cohen solicited Honig for $45,620 purportedly to pay for training and other expenses for multiple boxers. Cohen claimed that these monies were specifically earmarked for the following fighter-related expenses: Adebayo ($5,000); Feliz ($13,620 – airfare, hotel, meals for January 7 bout); Samir ($15,000 – advance); Plange ($12,000 – training).

117.    In reliance on Cohen's statements, Honig wired $35,000 to BBP on December 24 and $10,000 on December 29, 2021. Honig expected repayment of these loans in accordance with the Financing Agreements.

118.    More recently, Limeri emailed Honig copies of BBP's Wells Fargo bank statements from the period of October 2021 through February 2022.

119.    Based on Plaintiffs' review of those statements, Cohen used most, if not all, of the funds from Honig for Cohen's personal purposes instead of the purported business reasons he claimed. Of the $45,000 wired to BBP, Plaintiffs have identified at least $28,584.76 of funds Cohen diverted for apparently personal expenses: "Cashed Check" ($20,000), Premier Capital – personal loan payment ($1,500), Seminole Casino – cash withdrawal ($7,084.75).

*February 2022 – at least $13,190 advanced to BBP was used for Cohen's personal expenses*

120.    In a January 31, 2022, email, Cohen solicited Honig for $23,700 purportedly to pay for expenses related to three fights. Cohen detailed the following specific fighter-related expenses: Fernely Feliz ($18,500 – travel and related expenses for Chris Arnold bout on February 5, 2022), Solomon Adebayo ($2,700 – Haruna Osumanu bout on February 4, 2022), Solomon Adebayo ($2,500 – Nii Offei Dodoo bout on February 18, 2022).

121.    In reliance on Cohen's statements, Honig wired $23,700 to BBP on February 3, 2022. Honig expected repayment of this loan in accordance with the Financing Agreements.

122.    Upon information and belief Cohen used many of these funds for Cohen's personal purposes instead of for the Feliz and Adebayo bouts.

123.    Plaintiffs have identified potentially up to $10,510 of funds applied to the Feliz bout expenses.

124.    Upon information and belief, the remainder of the February 3, 2022 wire was used for personal expenses. For instance, Cohen used $3,084.99 for Superior Homes and made $2,340.85 in cash withdrawals at the Seminole Casino in Hollywood, Florida.

125.    Adebayo did not fight in the bouts Cohen claimed were coming up.

126.    Upon information and belief, Cohen diverted for his personal benefit additional monies received as advances from Honig in connection with purported boxing events.

### 6.    Payments associated with Gary Cully and Keith Hunter

*July 2022 - $25,000 advancement of expenses*
*August 2022 - $7,500 advancement of expenses*

127.    In an email dated July 13, 2022, Cohen told Honig that BBP could sign a ranked fighter named Gary Cully and that Cohen needed to give Cully a $25,000 signing bonus. Cohen told Honig that the bout between Cully and Hunter supposedly scheduled for September in the United Kingdom would generate $50,000 in revenue. Cohen had had Hunter under contract since 2018.

128.    Cohen told Honig that BBP and another promoter, Probellum, were entering into or had entered into an EPA with Cully that would result in BBP earning the $50,000 promotional fees but also up to $500,000 depending on who won the fight. Cohen claimed that if Hunter won the fight, the WBA would make him a mandatory challenger in a title bout, which would yield $500,000.

129.    In reliance on these and other statements by Cohen, on July 14, 2022, Honig wired to BBP $62,500, $25,000 of which was for Cully's bonus. Honig expected repayment of this loan in accordance with the Financing Agreements.

130.    On July 15, 2022, Cohen provided Honig with a copy of a supposed co-promotional rights agreement between BBP and Probellum regarding Gary Cully and the supposed EPA between BBP, Probellum, and Cully to justify his loan request.

131.    On August 8, 2022, Cohen solicited Honig for $7,500 for housing and training expenses for Hunter for the alleged upcoming Cully bout, informing Honig that the Cully-Hunter bout was on for September 30, 2022.

25

132.     In reliance on Cohen's statements about the upcoming bout and need for training, on August 10, 2022, Honig wired $27,000 to BBP, $7,500 of which was for housing and training for Hunter. Honig expected repayment of this loan in accordance with the Financing Agreements.

133.     But Cohen kept changing the purported date of the Cully-Hunter fight from September 2022 to October 2022. On October 30, 2022, in response to a question from Honig asking if "Hunter won," Cohen responded "Cully won." But this was highly misleading. Cully had not fought Hunter on October 29, but an entirely different fighter.

134.     Then in a text message sent on November 2, 2022, Cohen told Honig that Probellum had assigned its portion of the promotional rights for Cully to Matchroom Boxing.

135.     But this was a lie. Plaintiffs now understand that Cully had actually signed a promotional agreement with Matchroom Boxing months earlier in August 2022 and was never signed on with Probellum at all.

136.     Plaintiffs further understand that Cully never signed any agreement with BBP, GCP, or Cohen and that there was never any fight planned between Hunter and Cully. The purported agreements involving Probellum were, Plaintiffs now understand, forgeries.

137.     Cohen thus obtained money from Honig based on false statements and forged documents.

### 7.      Payments associated with Vladyslav Sirenko

*July 2022 - $37,500 to BBP*
*August 2022 - $5,750 to BBP*

138.     As with Cully, Cohen enticed Honig to loan moneys to BBP purportedly for another fighter, Vladyslav Sirenko, based on false promises that BBP would make $200,000 from a fight planned between Sirenko and Joe Joyce.

139.    On July 13, 2022, Cohen sent Honig an invoice seeking $25,000 for Sirenko's signing bonus and $12,500 for his training expenses.

140.    In reliance on these statements, on July 14, 2022 Honig wired to BBP $62,500, $37,500 of which was for the Sirenko-related expenses. Honig expected repayment of this loan in accordance with the Financing Agreements.

141.    On July 15, 2022 – to bolster his story about the Sirenko expenses – Cohen sent Honig an email attaching a supposed EPA between BBP and Sirenko.

142.    On August 8, 2022, Cohen claimed that he needed additional funds to cover Sirenko's and his trainer's visas for the upcoming fight with Joyce scheduled for September 24, 2022.

143.    In reliance on these statements, on August 10, 2022, Honig wired to BBP $27,000, $5,750 of which was for Sirenko-related expenses. Honig expected repayment of this loan in accordance with the Financing Agreements.

144.    On or about September 29, 2022, Cohen stated to Honig that Sirenko and BBP had entered into a "Step Aside Agreement" with Queensberry Promotions (Joyce's promoter), whereby BBP supposedly would be paid $100,000 for Sirenko to forgo a September bout scheduled between Sirenko and Joyce and instead fight Joyce in a December bout, which would result in a $450,000 payment to BBP. According to the purported Step-Aside agreement, the $100,000 fee was to be paid within seven business days of execution of the purported agreement.

145.    Some time in November 2022, Cohen stated to Honig that the proposed December 2022 Sirenko-Joyce bout was cancelled and according to an agreement between BBP and Queensberry Promotions, a new fight would be rescheduled and take place within 90 days of December 3, 2022.

146.     The Sirenko-Joyce bout was a fiction, and the purported EPA between BBP and Sirenko turns out to have been a forgery. On or about February 19, 2023, Sirenko's manager informed Honig that Sirenko did not have a contractual relationship with Defendants and never had a fight scheduled with Joyce. On top of that, Queenberry's representatives have since informed Plaintiffs that there was never any Step-Aside Agreement for a Joyce-Sirenko bout and that the document purporting to be a Step-Aside Agreement with Queensberry was a forgery.

147.     Cohen's fabrication of a Sirenko-Joyce bout, an EPA, and a Step-Aside agreement were all part of a course of deception intended to induce Honig to make the payments related to Sirenko, to continue making additional payments for other fighters, and to delay the day of reckoning. None of Honig's Sirenko-related payments to BBP was actually solicited for and applied to legitimate purposes.

**H.     Defendants impersonate Queenberry representatives and fabricate documents in order to keep soliciting money from Honig and to delay the day of reckoning**

148.     In or about March 2021, Cohen informed Honig that BBP and Queensberry Promotions (a UK-based company) had entered into an agreement relating to the promotion of a bout between Queensberry's Daniel Dubois and BBP's Bogdan Dinu that was scheduled to take place in June 2021. Cohen supplied Honig with a document purporting to be that agreement. The purported agreement provides that Queensberry would pay BBP approximately $700,000, and Cohen told Honig that the fighter (Dinu) would be paid $150,000, and that this would supposedly leave $550,000 for BBP. Plaintiffs now understand that this agreement was a forgery – the actual number in the authentic BBP-Queensberry agreement for the Dinu-Dubois bout was far lower than $700,000.

149.    On May 14, 2021, Jonathan Schwartz of BBP stated to Honig via email that BBP had instructed Queensberry to forward the entire fee due to BBP under the BBP-Queensberry agreement directly to Honig's designee as a repayment of outstanding loans that GCP and Cohen owed to Plaintiffs under the Financing Agreements. In other words, BBP led Honig to believe that Honig would receive $550,000 – the amount that Cohen had claimed (with supporting "evidence" from a forged document) BBP supposedly would receive from Queensberry.

150.    It appears that BBP did issue an instruction to Queenberry, because on or about June 14, 2021 (following the Dinu-Dubois bout), Queensberry wired $201,486.79 to Honig's designee.

151.    However, Cohen had led Honig to believe that BBP (and therefore Honig) would receive approximately $350,000 more under the BBP-Queenberry contract (the difference between $550,000 and the approximately $200,000 actually sent). To perpetuate this fiction, to induce Honig to continue supplying Cohen and BBP with money, and to stave off the inevitable moment of reckoning when Honig would discover the lies and enforce his rights, Cohen embarked on an even more audacious – and bizarre – fraud.

152.    In or about June 2021, Cohen began to impersonate Queenberry CEO George Warren and his father, Queensberry founder Frank Warren.

153.    Plaintiffs now understand that Cohen registered a fake domain name for Queenberry, frankwarrensqp.com. Cohen also created email addresses supposedly for George Warren and Frank Warren: George@frankwarrensqp.com and frank@frankwarrensqp.com.

154.    Cohen used his own email addresses, and what Plaintiffs now understand to be the fake George Warren email address, to create an email string seemingly reflecting the negotiation of a purported "settlement agreement" between BBP and Queensberry over the $350,000 that

29

supposedly remained in dispute between the parties. Plaintiffs now understand that these emails and the settlement agreement were fakes.

155.    "George Warren" and "Frank Warren" also began corresponding with Honig, or with Cohen (with copies sent to Honig), over, among other things, the amounts that Queensberry supposedly owed BBP. At various times, "George Warren" promised to pay sums to Honig; "Frank Warren" stated that he was "keenly aware of the urgency in resolving this matter."

156.    Plaintiffs did not learn that the Queensberry emails and the agreements to which Queensberry was supposedly party were fakes – and that the prospect of Queensberry paying hundreds of thousands of dollars more to Plaintiffs was a pure illusion fabricated by Cohen – until the real George Warren reached out to Honig after Honig had filed an earlier version of this complaint in the District of New Jersey. The real George Warren informed Honig that Queensberry had got wind of the complaint and explained that the emails supposedly from him were not sent by him and came from an email address that was not the email address he actually uses.

157.    The real George Warren has supplied Plaintiffs with a Declaration attesting to these and related points.

158.    In the belief that Queensberry was stiffing BBP (to Plaintiffs' detriment), Honig, among other out of pocket costs, spent substantial sums to pay attorneys in the United Kingdom to draft a complaint that BBP could file against Queensberry and the Warrens.

159.    Honig and/or the attorneys repeatedly asked Limeri, a putative authorized representative for BBP, for permission to file the draft complaint. Acting at Cohen's direction, Limeri withheld permission. We now know why: because the whole story that Queensberry owed BBP more money was a fiction concocted by Cohen.

160.    Cohen impersonated the Warrens and fabricated payment obligations from Queensberry to BBP in order to lead Honig to believe that he would be paid more money by Queensberry. Cohen did this to cover up other lies Cohen had told, to stave off pressure from Plaintiffs, and to induce Plaintiffs to continue lending Defendants more money. Honig would never have lent Cohen any more money if he had known that, starting in 2021, Cohen had been lying about Queensberry's dealings with BBP, much less known that Cohen was impersonating the Warrens and fabricating documents.

## I.    Veil-Piercing / Alter Ego Allegations

161.    Cohen created, operated, and used GCP and BBP as the means to execute his fraudulent scheme detailed above. GCP and BBP have no separate, independent identity from Cohen but are merely his shell corporations that Cohen completely dominated and controlled.

*GCP is Cohen's alter ego*

162.    Cohen is the majority owner of GCP and exercises complete control of GCP.

163.    On information and belief, GCP did not observe corporate formalities.

164.    GCP was consistently undercapitalized as its debts to Plaintiffs alone (not to mention numerous third parties) consistently outweighed GCP's assets and/or income. As discussed above, GCP was forced to rely on Cohen and/or BBP to guarantee and/or assume its debts. GCP's debts and assets were always commingled with Cohen's.

165.    On top of that, on information and belief, Cohen treated GCP as his personal piggy bank, using loans from Plaintiffs to pay Cohen's personal expenses.

166.    Cohen abused GCP's corporate form by, among other things,

a.    Requesting, on behalf of GCP, loans from Plaintiffs for non-business purposes;

665000.v3

    b.   Fabricating the Assignment and Assumption Agreement that was purportedly between GCP and MTK for the purpose of eliciting additional financing from Plaintiffs for GCP; and

    c.   Fabricating emails and other documents purportedly from the WBA to GCP as part of a scheme to elicit additional financing from Plaintiffs for GCP.

*BBP is Cohen's alter ego*

167.    Cohen has at all times exercised complete domination and control over BBP.

168.    As discussed above, Cohen used BBP money for personal purposes, treating BBP as his personal piggy bank from which to extract money.

169.    On information and belief, BBP did not observe corporate formalities.

170.    BBP was consistently undercapitalized as its debts to Plaintiffs alone (not to mention numerous third parties) consistently outweighed BBP's assets and/or income. BBP was created in 2020, on information and belief specifically to allow Cohen to shield or hide revenues and assets from creditors; by then, Cohen and GCP were already hopelessly indebted. As discussed above, BBP assumed Cohen's and GCP's debts because they could not repay their debts and BBP similarly never was able to repay the assumed debt of Cohen or GCP, or any debts of its own. BBP's debts and assets were always commingled with Cohen's.

171.    Further, Cohen has treated BBP as his personal piggybank, using funds paid to BBP for his own personal expenses.

172.    Cohen abused BBP's corporate form by, among other things,

    a.   Requesting, on behalf of BBP, loans from Plaintiffs for non-business purposes;

665000.v3

b.  Fabricating agreements purportedly between Probellum, BBP, and Cully for the purpose of eliciting additional financing from Plaintiffs for BBP; and

c.  Fabricating agreements and emails purportedly with Queensberry as part of a scheme to elicit additional financing from Plaintiffs for BBP.

## COUNT 1

### BREACH OF STANDSTILL AGREEMENT AND RELATED AGREEMENTS (AGAINST COHEN AND BBP)

173.   Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 172 as though fully set forth here, and incorporate those allegations herein by reference.

174.   Plaintiffs and Defendants are parties to the Financing Agreements

175.   The Financing Agreements are valid and enforceable.

176.   As set forth above, the Financing Agreements created obligations by Cohen and BBP to pay back any amounts borrowed from Plaintiffs.

177.   Plaintiffs performed under the Financing Agreements. They loaned Cohen, GCP, and BBP nearly $2 million, of which $1,637,420.71 remains outstanding and unpaid.

178.   Pursuant to the Financing Agreements, Cohen, GCP, and BBP were also required to share revenues for all bouts involving fighters promoted by Defendants. Cohen, GCP, and BBP failed to share those revenues as required.

179.   Cohen directly obligated himself personally on the Financing Agreements.

180.   Furthermore, any obligation or debt owed by GCP under the Financing Agreements is an obligation of Cohen because Cohen used GCP as an alter ego.

181.   Any obligation owed by GCP under the Financing Agreements is an obligation of BBP, which agreed to assume, and did assume, such obligations.

182.    Any obligation or debt owed by BBP under the Financing Agreements is an obligation of Cohen, who used BBP as an alter ego.

183.    In short, all of GCP's obligations under the Financing Agreements are obligations of Cohen and BBP. All of BBP's obligations under the Financing Agreements are obligations of Cohen.

184.    Cohen and BBP are liable for $1,637,420.71, plus accrued and accruing interest.

## COUNT 2

### FRAUD
### (AGAINST COHEN and BBP)

185.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 184 as though full set forth here, and incorporates those allegations herein by reference.

186.    As set forth above, Cohen, acting on behalf of himself, GCP and/or BBP, made material false or misleading representations to Plaintiffs to induce them to wire cash to GCP or BBP. Cohen also forged agreements and emails, and impersonated other boxing promoters as well as the president of the WBA.

187.    When Cohen made each of these statements and engaged in these schemes, he knew that they were false or misleading and would deceive Plaintiffs and that Plaintiffs were relying on Cohen's statements.

188.    Plaintiffs reasonably and/or justifiably relied on Cohen's false statements and on the apparent authenticity of emails and other documents that Cohen faked.

189.    Had Cohen told the truth about the reasons for the requested payments, Plaintiffs would not have sent those payments. Further, Plaintiffs would never have lent Defendants any more money if they had known of Defendants' lies, including that Cohen had fabricated documents and was impersonating the president of the WBA and various boxing promoters.

665000.v3

190.     Additionally, Honig would not have incurred substantial out of pocket costs (including on lawyers to draft a Complaint for BBP to file against Queensberry), if he had known that the BBP-Queensberry dealings were fake.

191.     As a direct and proximate result of Plaintiffs' reliance on Defendants' false and misleading statements and deceptive devices, Plaintiffs have suffered damages in an amount to be determined at trial, but believed to be well over a million dollars (in the form of amounts lent or advanced under false pretenses as to their intended use, or otherwise induced by Defendants' fraud), plus tens of thousands of dollars in legal fees and other out of pocket expenses incurred as a result of the Queensberry fraud.

## COUNT 3

### UNJUST ENRICHMENT (in the alternative to breach of contract)
### (AGAINST COHEN AND BBP)

192.     Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 172 as though full set forth here, and incorporates those allegations herein by reference.

193.     This Count is pled as an alternative to the Count for breach of contract to the extent that any applicable contract or arrangement is found not to exist or not to be enforceable.

194.     As set forth herein, Plaintiffs paid monies to GCP (thus Cohen as its alter ego) and/or BBP under false pretenses that the moneys would be repaid and/or were for proper business purposes.

195.     Cohen and BBP benefited from receiving these moneys while not providing any benefit to Plaintiffs.

196.     The retention of that benefit by Cohen and BBP is inequitable.

## COUNT 4

### ACCOUNTING
### (AGAINST COHEN AND BBP)

197.    Plaintiffs reallege each and every allegation set forth in paragraphs 1 through 196 as though full set forth here, and incorporates those allegations herein by reference.

198.    Plaintiffs and Defendants had either a fiduciary or trust relationship.

199.    In addition, Section 3 of the Standstill Agreement entitled Plaintiffs to access information and documentation of Defendants required to verify their obligations under the Standstill Agreement.

200.    Cohen and his entities' accounting is complex. At any given time, the entities have had a complicated web of relationship among a varying group of boxers, promoters, co-promoters, and/or managers.

201.    Plaintiffs need documents to understand the total revenues received by Cohen, GCP, and BBP over the last four years as well as how various funds from Plaintiffs were used. Without this information, Plaintiffs will be unable to know how Defendants misused their money and how many revenues were improperly kept, instead of shared as required by the parties' agreements and understandings.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A.  Damages, including punitive damages, in an amount to be determined at trial;

B.  An accounting and an order of disgorgement;

C.  A preliminary and permanent injunction, attachment, and asset freeze to prevent Defendants from dissipating assets;

665000.v3

D.  An award of costs; and

E.  Such other relief as the court deems just and equitable.


Dated: November 21, 2023                    Respectfully submitted,

                                            KATSKY KORINS LLP

                                            By:  ___/s/ Daniel R. Walfish_____
                                                Daniel R. Walfish
                                                Rachel Penski Fissell
                                                605 Third Avenue
                                                New York, NY 10158
                                                Tel.: 212-716-3293
                                                Email: dwalfish@katskykorins.com

                                                *Attorneys for Plaintiffs*